In re Joseph ZUPSIC, Former Magisterial District Judge In and For Magisterial District 36–3–03 Beaver County.

No. 1 JD 05.

Court of Judicial Discipline
of Pennsylvania.

Dec. 29, 2005.

Before: SPRAGUE, P.J., HALESEY, CAPOFERRI, PANEPINTO, O'TOOLE, SANDLER and LAMB, JJ.

OPINION BY Judge LAMB.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on February 9, 2005 against Magisterial District Judge Joseph Zupsic (Respondent) in which the Board charges the Respondent with various violations of the Pennsylvania Constitution and of the Rules Governing Standards of Conduct of Magisterial District Judges. These charges arise out of five separate incidents which are set out separately in five parts in the Complaint. These five incidents are identified as:

Part 1. *Commonwealth v. Anthony Martorella*, set out in paragraphs 3–6 of the Complaint. The Board charges that Respondent's conduct described in Part 1 is such that:

(a) brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(b) prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

Part 2. *Commonwealth v. David Presto*, set out in paragraphs 7–8.3.5 of the Complaint. The Board charges that Respondent's conduct described in Part 2 is such that:

(a) brings the judicial office into disrepute, a violation of Article V,

§ 18(d)(1) of the Pennsylvania Constitution, and

(b) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Part 3. *Commonwealth v. William G. Cornell*, set out in paragraphs 9–12 of the Complaint. The Board charges that Respondent's conduct described in Part 3 is such that:

(a) brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(b) prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Part 4. *Commonwealth v. Kelly Jo Schupp*, set out in paragraphs 13–18 of the Complaint. The Board charges that Respondent's conduct described in Part 4 is such that:

(a) brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(b) prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Part 5. *Commonwealth v. Anson M. Murgenovich*, set out in paragraphs 19–23 of the Complaint. The Board charges that the conduct described in Part 5 is such that:

(a) brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution,

(b) prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

The Board and the Respondent have submitted stipulations as to some of the facts in the case pursuant to C.J.D.R.P. No. 502(D)(2). The Court accepted the pertinent stipulations and proceeded to trial. The Court now makes its Findings of Fact; those which have been stipulated are so designated.

## II. *FINDINGS OF FACT*

1. The Judicial Conduct Board (hereinafter referred to as "Board") is empowered by Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania to file formal charges alleging ethical misconduct on the part of judges and to present the case in support of the formal charges before the Court of Judicial Discipline. (Stipulation No. 1).

2. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania and Judicial Conduct Board Rule of Procedure 31(A)(3), promulgated by the Pennsylvania Supreme Court on March 20, 1995 (amended 1996), the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or justice of the peace, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline. (Stipulation No. 2).

3. Since on or about November 1998, the Respondent has served continuously to March 5, 2005, when he resigned as Magisterial District Judge for Magisterial District 36–3–03 in Beaver County, the Thirty–Sixth Judicial District, Pennsylvania, encompassing the Townships of Center, Greene, Potter and Raccoon, and the Boroughs of Georgetown, Hookstown, Monaca and Shippingport, with an office located at 226 Front Center Grange Road, Aliquippa, Pennsylvania 15001. (Stipulation No. 3).

*PART 1. Commonwealth v. Anthony Martorella*

4. In April of 1999 Jeffrey Dobo reported to the Pennsylvania State Police that he had accumulated a debt with Anthony Martorella and was unable to pay it. As a consequence, Dobo reported, Martorella was threatening that he was going to kill Dobo or injure his family (N.T. 162).

5. The State Police instituted an investigation and, on April 28, 1999, had officers in place at Dobo's home and had placed several phone taps on Dobo's phones. Trooper Donald Neill was the officer in charge at Dobo's home. On that date, Martorella called Dobo at his home. Dobo told Martorella he was not going to pay him back the money. Martorella became enraged and told Dobo he was coming to his house to kill him. Shortly thereafter, Martorella came speeding up the road to Dobo's house, jumped out of the car, ran to the front door, forced his way into the residence, all the time yelling that he was going to kill Dobo, at which point he was arrested by the State Police officers who were present at the Dobo residence. (N.T. 162–64).

6. Trooper Neill filed a criminal complaint with District Justice Swihart on April 28, 1999 charging Burglary, Terroristic Threats, Theft by Extortion and

Harassment by Communication at Docket # CR–95–99. (Stipulation No. 4).

7. District Justice Swihart set bail at $250,000 and scheduled a preliminary hearing for June 1, 1999. (N.T. 164–65).

8. Sometime shortly before the preliminary hearing, Trooper Neill received a telephone call from Respondent who asked him to stop by his office in the next day or two and talk to him. Trooper Neill did go to Respondent's office and, when he did, Respondent closed the doors and asked about the *Martorella* case. Respondent told Neill that Martorella was either a relative or friend of Respondent's previous employer and that Martorella was "really not a bad guy" and asked "if there was anything [Trooper Neill] could do about the case." (N.T. 165–67).

9. Trooper Neill told Respondent that the case involved a very serious incident and that there was nothing that could be done and that the State Police would be obligated to pursue the charges as filed. Despite Neill's response, Respondent persisted to insist that Martorella wasn't a bad guy and that he (the Respondent) would appreciate it if there was anything Neill could do for Martorella. (N.T. 167).

10. Immediately after this meeting, Trooper Neill returned to the State Police Barracks and reported the incident to David Liberum, supervisor of the Pennsylvania State Police White Collar Crime Unit. He reported it to no one else, including the Judicial Conduct Board. (N.T. 172, 176–77).

11. The Judicial Conduct Board first became aware of Respondent's conduct in the *Martorella* case in August 2003, when, during the course of its investigation of Respondent's conduct in the *Kelly Jo Schupp* case, the Board's Investigator, Douglas Miller, was advised by a confidential source that he should talk to Trooper Neill about Respondent. A few days later Miller interviewed Neill who then reported the facts of the *Martorella* case set out in Findings of Fact Nos. 4—9. (N.T. 180–82).

12. Some time after Martorella's preliminary hearing at which he was held for court, Trooper Neill received a call at his home from the Respondent. On this occasion, Respondent importuned Trooper Neill to consider ARD for Martorella. Trooper Neill informed Respondent that the *Martorella* case "was not an ARD appropriate case." Martorella eventually pled guilty to making terroristic threats. (N.T. 167–68).

PART 2. *Commonwealth v. David Presto*

13. On or about March 21, 2001, David Presto was charged under Docket # CR–59–01 with assaulting an inmate at the Beaver County Jail while Presto was employed there as a guard. The complaint was filed before Magisterial District Judge Janet M. Swihart, District Court 36–3–04. (Stipulation No. 5).

14. Since at least as early as 1999, until August 2004, David Presto's father, James Presto, was a frequent visitor at Respondent's office, engaging in private meetings with Respondent in the courtroom or in his office "most of the time behind closed doors." (N.T. 122–31, 133–34, 136). During this period of time Respondent had lunch with James Presto at a local restaurant on a number of occasions. (N.T. 134, 137). During this period of time James Presto had no business having to do with Respondent's district court (N.T. 125), but did have business with Respondent unrelated to Respondent's district court. (N.T. 128–29; 141–53).

15. Sometime in early 2000 a friend of Respondent's, named John Sabino, told Respondent he was in serious financial trouble and asked Respondent if he would raise $50,000 which he would repay in two

or three weeks. Respondent did raise the $50,000 in cash which included $12,000 from James Presto and $10,000 from himself. (N.T. 145–46; Zupsic deposition, p. 53). Respondent then delivered the cash to Mr. Sabino in the parking lot of D'Angela's Doughnut Shop in Rochester, Pennsylvania. (N.T. 146, Zupsic deposition, p. 54). After two or three weeks passed without repayment, Respondent spoke with Sabino who told him "he couldn't get the money." Shortly thereafter, Sabino gave Respondent checks, including one for Presto, ostensibly in repayment of the cash delivered to Sabino by Respondent. The checks, including the check to Presto, "bounced" whereupon Respondent called Sabino and advised him "Mr. Presto's probably gonna pursue this legally to get his money back." (Zupsic deposition, p. 56).

16. Presto then filed bad check charges with the Beaver County District Attorney and investigation of the case was assigned to Detective Timothy Staub. In the course of his investigation Detective Staub interviewed Respondent on February 14, 2000. (N.T. 141, 145–49).

17. At Sabino's preliminary hearing the charges against him were dismissed upon Presto's advice that he had been "made whole." (N.T. 146–47).

18. On April 24, 2001, Respondent was assigned to conduct preliminary hearings in Beaver County Central Court and the charges against David Presto, James Presto's son, were listed in Central Court that day and came on for hearing before Respondent. (N.T. 113, 115).

19. At the preliminary hearing for David Presto, the Commonwealth was represented by Assistant District Attorney William Hare, Esquire and Presto by John Havey, Esquire. (N.T. 112–13).

20. At no time, either before or during the preliminary hearing for David Presto, did Respondent advise counsel of his personal and business relationship with David Presto's father nor otherwise bring up the subject of his possible recusal. (N.T. 120).

21. At the conclusion of the testimony, Respondent dismissed the case. (N.T. 115).

*PART 3. Commonwealth v. William G. Cornell*

22. On or about June 30, 2001, Officer Joseph Hadden of the Shippingport Police Department initiated a traffic stop of William G. Cornell for possible drunk driving. (Stipulation No. 10).

23. Cornell was taken to the Shippingport Police Station where a breathalyzer test was administered by Chief of Police Michael Pantaleo. The breathalyzer test determined Cornell's blood alcohol to be 0.10 sufficient to support a charge of driving under the influence of alcohol, (N.T. 90–91) nevertheless, Cornell was cited for Public Drunkenness by Citation No. P1282472–2 filed in Respondent's office on July 2, 2001. (Stipulation No. 10).

24. The decision to cite Cornell for the lesser offense of public drunkenness was made by Chief Pantaleo. (N.T. 91).

25. Sometime after the citation was filed, Chief Pantaleo was in Respondent's office on other business when Respondent called the Chief back into the kitchen and told him that the Cornell hearing was coming up and that Cornell was a union guy and Respondent wanted to help him out. The Chief responded by pointing out that Cornell had already gotten a break. There was no further conversation at that time. (N.T. 92).

26. On the morning of September 4, 2001 at the request of the Pennsylvania State Police, Chief Pantaleo wore a body wire and engaged Respondent in conversation outside the back door of Respondent's office in an attempt to entice Respondent

into saying something incriminating. (N.T. 93).

27. A transcript of relevant portions of the audiotape of that conversation, stipulated to be accurate, is as follows:

CHIEF PANTALEO: I wanted to talk to Joe.

FEMALE: Oh. I'm thinkin', I thought I seen you out here. And then you never came in.

CHIEF PANTALEO: Yeah.

A WOMAN: Hey, Bufe.

A VOICE: (Unintelligible)

CHIEF PANTALEO: How you doin', Joe?

MR. ZUPSIC: Hey, we got that guy today.

CHIEF PANTALEO: Pardon me?

MR. ZUPSIC: I said we got that (unintelligible).

CHIEF PANTALEO: Yeah, that's what I wanted -- you know, it's -- two different guys down the plant come in. One guy -- I don't even know who the hell he was -- says, Hey, it's all taken care of, you know?

And he says if I wanted somethin', you'd hose me.

MR. ZUPSIC: Other words, they're pissed off about it.

CHIEF PANTALEO: Yeah.

MR. ZUPSIC: I--I tell you, man, I already committed on it. I mean, you know.

CHIEF PANTALEO: Um-hmm.

MR. ZUPSIC: I-- you know.

CHIEF PANTALEO: Okay. Well, like I said, I-- you know, it's--

MR. ZUPSIC: Yeah.

* * * *

MR. ZUPSIC So he don't want to do that.

CHIEF PANTALEO: I guess not. I don't know.

So Dale says, well, just don't worry about it, Mike.

I says, okay.

But, anyhow, that -- that Cornell guy is what I just -- you know, I don't care, you know.

MR. ZUPSIC: Like I said, I mean, --

CHIEF PANTALEO: Yeah.

MR. ZUPSIC: -- I -- you know, it's --

CHIEF PANTALEO: Yeah.

MR. ZUPSIC: -- all kind of fuckin' heat on that one, so . . .

CHIEF PANTALEO: Okay. Okay. Okay.

MR. ZUPSIC: All right, Mike. Hey, once in a while we gotta do this, man.

CHIEF PANTALEO: Okay.

Mr. ZUPSIC: You know?

CHIEF PANTALEO: All right.

MR. ZUPSIC: You know?

CHIEF PANTALEO: Okay, Judge. No problem.

MR. ZUPSIC: Is it -- it's not you anyways. It's your guy, right?

CHIEF PANTALEO: No. Yeah.

MR. ZUPSIC: It's your guy comin'?

CHIEF PANTALEO: Yeah, I guess. I haven't talked to him.

MR. ZUPSIC: Yeah.

CHIEF PANTALEO: He only works a couple days a week so . . .

MR. ZUPSIC: Yeah. Okay, man. You hangin' around or are you takin' off?

CHIEF PANTALEO: No, I'm leavin'. Okay.

MR. ZUPSIC: See you.

CHIEF PANTALEO: Uh-huh.

Well, he said he was committed to it. (Unintelligible.)

Turn the tape -- or the camera off.

Okay. Okay. I just hope everything works out.

Well, it's 9:33. I'm leavin' the magistrate's office. Had it on tape. So I just -- he said he's committed to it.

28. Joseph A. Hadden, III, ex-officer of the Shippingport (Beaver County) Police Department was the prosecuting officer in *Commonwealth v. William G. Cornell*, NT-598-01. (Stipulation No. 11).

29. The case against Cornell at NT-598-01 was dismissed on September 4, 2001, due to the failure of Officer Hadden to appear at the scheduled hearing. (Stipulation No. 12).

*PART 4. Commonwealth v. Kelly Jo Schupp*

30. On or about November 14, 2001, Kelly Jo Schupp was stopped at Boscov's Department Store at the Beaver Valley Mall on the suspicion of shoplifting. She was subsequently charged by summons with the offense of retail theft. (Stipulation No. 13).

31. On February 19, 2002, Patricia Beahan, head of security for Boscov's at the Beaver Valley Mall, filed a private criminal complaint against Schupp in the Respondent's office under Docket No. CR-69-02. Schupp appeared before the Respondent on March 21, 2002, for preliminary arraignment. (Stipulation No. 14).

32. On that date when Schupp was called into Respondent's courtroom for her arraignment, Respondent asked her to tell him what happened, which she did. On that occasion the following also took place between Respondent and Schupp:

— he told her she didn't look like a person who would be guilty of shoplifting.

— he told her that Patricia Beahan, the Boscov's employee who filed the charges in Respondent's court did so frequently.

— she told him that she was in the middle of divorce proceedings and that she was concerned that the criminal charge might affect her right to the custody of her child.

— he explained to her that the charges could be reduced to a lesser charge or that she could be placed in ARD for retail theft.

— he gave her his business card and his cell phone number and told her he wanted to help her and he would be in touch with her. (N.T. 47–50).

33. Between March 28, 2002 and June 10, 2002, Schupp made twelve calls on her cell phone to Respondent's cell phone (N.T. 54–56, Joint Exhibit No. 4), and he called her a number of times and recommended that she engage a particular lawyer to represent her in the case. (N.T. 51). During 2002 Respondent's cell phone number was 724–910–9514. (Stipulation No. 20).

34. On or about June 21, 2002, the Respondent had a conversation with Patricia Beahan at Boscov's Department Store at the Beaver Valley Mall. (Stipulation No. 15).

35. On that occasion Patricia Beahan was in her office at the Boscov's store when the store operator who was located right outside Beahan's office, announced that there was a judge here to see her. Ms. Beahan went to the operator's booth where Respondent was, and invited him to come into her office, whereupon the following transpired between Respondent and Beahan:

— he told her he was there regarding the case of Kelly Jo Schupp, that she, Schupp, was going through some hard times and inquired if there was a way to change the charge from retail theft to disorderly conduct.

— she told him that she did not have authority to do that but offered to contact her superiors in the corporate offices who might have that authority.

— he said it would be alright if she did that and it would be okay if they didn't want to do it.

— she pointed out that ARD would certainly be an option but he said that would still have a negative impact on her child custody case. (N.T. 21–24).

— Respondent told Beahan that his visit was "unofficial." (N.T. 23, 28–29).

36. Ms. Beahan did contact corporate headquarters and was directed to report the encounter to the district attorney's office. (N.T. 24).

37. Ms. Beahan did report her encounter with Respondent of June 21, 2002 to Beaver County Assistant District Attorney William Hare. (N.T. 24–25).

38. In addition to the telephone conversations she had with Respondent, Ms. Schupp met Respondent for lunch at Humphrey's Restaurant near the Beaver County Mall. This meeting took place before she went to court for the preliminary hearing on July 12, 2002. On that occasion Respondent told Schupp that he knew Patricia Beahan personally and that he was going to talk to her because "he thought . . . that I deserved an opportunity to get a lesser charge than the ARD, I believe, and that was the conversation in a nutshell." (N.T. 52–53).

39. Kelly Jo Schupp's preliminary hearing was continued at least once (N.T. 30, 40) and was eventually scheduled for July 12, 2002 in the Beaver County Courthouse before Respondent. (N.T. 33). On that date Ms. Beahan, Assistant District Attorney Hare and Kelly Jo Schupp and her attorney were present in Respondent's court for the preliminary hearing. (N.T. 29, 39).

40. On that day, Schupp and her counsel waived the preliminary hearing pursuant to an agreement between the assistant district attorney, Schupp and her counsel, with the consent of Patricia Beahan as Boscov's representative. A plea agreement was entered into wherein Schupp was to obtain ARD before the Court of Common Pleas of Beaver County at a later date. (Stipulation No. 16).

41. Prior to the arraignment by the Respondent of Kelly Jo Schupp, she had never met, spoke with or knew of the Respondent. (Stipulation No. 19).

PART 5. *Commonwealth v. Anson M. Murgenovich*

42. On May 23, 2003, Patrolman Robert Applegarth filed a criminal complaint CR–244–02 against Anson M. Murgenovich. The charge was driving under the influence of alcohol, 75 Pa.C.S.A. § 3731(a)(4)(ii). (Stipulation No. 21, Joint Exhibit No. 5).

43. Sometime shortly after Applegarth filed the complaint against Mr. Murgenovich, Officer Applegarth was in Respondent's court on other business. On that occasion Respondent asked to speak to Officer Applegarth and the two entered Respondent's chambers. No one else was present and Respondent said to Officer Applegarth: "I see you filed a charge against Anson. He's a friend of ours. Do you think there's something we could do to help him out?" Respondent then told Officer Applegarth that he was going to be the district justice on the bench on the day Mr. Murgenovich's preliminary hearing was scheduled. (N.T. 65–66).

44. During the conversation in Respondent's chambers, Respondent did not ask Officer Applegarth to drop the charges;

he just made a general inquiry of Applegarth as to whether anything could be done. (N.T. 70).

45. The next day Officer Applegarth reported this encounter to his Chief of Police. (N.T. 66).

46. The preliminary hearing for that case was scheduled on July 8, 2002 at 11:00 a.m. in Beaver County Central Court. (Stipulation No. 22).

47. Patrolman Applegarth did not attend the scheduled preliminary hearing because of scheduled firearm training. (Stipulation No. 23).

48. Patrolman Applegarth advised the Beaver County District Attorney of his unavailability for the preliminary hearing on the morning of that hearing. (Stipulation No. 24).

49. Patrolman Applegarth's failure to appear at the hearing was solely because of scheduled firearm training. (Stipulation No. 25).

50. On the day of the preliminary hearing, the Commonwealth was represented by Assistant District Attorney William Hare, who, upon learning of the unavailability of Officer Applegarth, made a motion for a continuance. Respondent denied the motion and dismissed the case at the request of Mr. Murgenovich. (N.T. 85).

### III. DISCUSSION

The amendment to the Constitution of Pennsylvania of 1993 established the Judicial Conduct Board and this Court, and provided certain specific instructions for the conduct of proceedings before this Court:

> All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evi-

dence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Article V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

> The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue .... It is not necessary that the evidence be uncontradicted ... provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986). *See, also, La Rocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963), and *In re Cicchetti*, 697 A.2d 297, 306 (Pa.Ct.Jud.Disc.1997).

*PART 1. Commonwealth v. Anthony Martorella*

The Board has charged the Respondent's conduct set out in Findings of Fact Nos. 4–12 is such that:

(a) brings the judicial office into disrepute; and

(b) prejudices the proper administration of justice.

The Respondent, however, has filed a motion to dismiss the charges arising out of Respondent's conduct relating to the *Martorella* case. Respondent bases his motion on Rule 15 of the Judicial Conduct Board's Rules of Procedure. That Rule provides:

RULE 15. TIME LIMITATIONS

Except where the Board determines otherwise for good cause, the Board shall not consider complaints arising from acts or omissions occurring more than four years prior to the date of the complaint, provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

■ Examination of Respondent's motion reveals that he misconstrues Rule 15. Respondent points out that the acts of Respondent which provide the basis for the charges in the *Martorella* case occurred before February 14, 2000 (which is true) and that the Board filed its Complaint with this Court on February 9, 2005—more than four years later. However, Rule 15 does not address the lapse of time between the occurrence of acts or omissions of a judicial officer and the filing of the Complaint in this Court, but rather, the time which intervenes between the occurrence of the acts or omissions and the receipt of the complaint by the Judicial Conduct Board. This is clear. The word "complaint" appears frequently in the Judicial Conduct Board's Rules of Procedure, and review of these Rules leaves no question that in every instance the reference is to a "complaint" filed by a "complainant" with the Board. See, e.g. Rules 10, 11, 16, 17, 18, 25, 26, 27, 28, 30, 31. By contrast, whenever the Rules refer to a Complaint filed by the Board in this Court the term

"Board Complaint" is used, see, e.g. Rules 13, 34. Moreover, Rule 1 provides definitions of the two terms as follows:

Board Complaint is the document setting forth the formal charges and filed by the Board to initiate proceedings in the Court of Judicial Discipline.

Complaint means a document setting forth information alleging conduct within the jurisdiction of the Judicial Conduct Board pursuant to Pa. Const. Art. V, § 18.

That having been said, the fact is that no written "complaint" having to do with the *Martorella* case was ever filed with the Board. The facts are that Board investigator, Douglas Miller, while investigating Respondent's conduct in the *Kelly Jo Schupp* case in August 2003, was advised to speak to Trooper Neill about the Respondent. Miller then spoke to Neill who, in August, 2003, told him about his encounters with the Respondent which took place before Martorella's preliminary hearing in 1999 and before Martorella's guilty plea in February 2000. Thus, no "complaint" was filed with the Board, rather, after Miller's interview of Neill, the Board initiated its investigation. This the Board is constitutionally authorized to do. Pa. Const. Art. V, § 18(a)(7) provides:

(7) The board shall receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board . . . .

In this case the Board's investigation was initiated in August 2003. In order to determine whether this was more or less than the four-year limitation of Rule 15, we must determine whether the acts giving rise to the charges related to the *Martorella* case took place more or less than four years earlier.

Respondent had two conversations with Trooper Neill in which he tried to get Neill to drop or lower the charges against *Mar-*

*torella.* The first took place at or about the time of Martorella's preliminary hearing. (N.T. 166). The preliminary hearing was held on June 1, 1999. (N.T. 164–65). This was two and a half to three months *more* than four years before August 2003 when Neill provided Miller with the report of Respondent's intervention in the *Martorella* case. The second intervention took place on the telephone "at one point in time after the preliminary hearing [June 1, 1999] and prior to the pleading [the entry of the guilty plea on February 14, 2000]." (N.T. 168). There is no other evidence fixing with any more precision the date of the second conversation. This is important because if it occurred *after* August 1999, Rule 15 could not operate to bar the Board from considering that conversation inasmuch as it would have occurred *less* than four years before the Board obtained information from Trooper Neill alleging conduct within its jurisdiction and initiated its investigation of the *Martorella* case. It is important, also, because, if the second conversation took place after August 1999, then it would bring into play the exception to the four-year limitation of Rule 15 which provides:

> [W]hen the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

Thus, if the second conversation took place after August 1999, the Board could consider the first conversation, for Respondent's second encounter with Trooper Neill was certainly "the last episode of ... a pattern of recurring judicial misconduct" which would enable the Board "to consider all prior acts or omissions related to such ... [a] pattern of conduct."

However, while we might be inclined to judge that the second encounter occurred closer to the entry of the plea, in February 2000 (because Respondent was discussing ARD with the Trooper), than it did to the time of the preliminary hearing the previous June, this has not been established. It is the Board's burden to do this and to do so by "clear and convincing evidence."[1] This the Board has not done. Thus, the Court cannot make a finding that the second encounter took place within the four-year limitation of Rule 15 or that the case can be brought within the "pattern of conduct" exception contained in the Rule.

■ It remains for us, nevertheless, to determine whether the Board was justified in determining that "good cause" existed in this case such that permitted it to consider Respondent's conduct in the *Martorella* case even though it occurred two or three months more than four years before the information was received from Trooper Neill and the investigation was initiated. Rule 15 begins with the following clause:

> Except where the Board determines otherwise for good cause, the Board shall not consider complaints ....

Obviously, in this case, the Board did determine that good cause existed for it to consider the Martorella episodes—because it did consider them. It now asks this Court to affirm that determination.[2]

---

1. *See,* p. 885, *supra.*

2. In an early case before this Court, the Board contended that its determination of "good cause" was entirely within its discretion and not reviewable by this Court. We rejected that argument. We said: "We therefore find that reviewing the Board's compli-

ance with its Rule 15 is a matter within our purview—indeed it is our duty ...." *In re Cicchetti,* 697 A.2d 297, 308 (Pa.Ct.Jud.Disc. 1997). Indeed, the Pennsylvania Supreme Court has held: "We emphatically reject the assertion that the board's compliance with its rules of procedure is absolutely beyond judicial review. The rules exist in part to insure

We do affirm that determination for the reasons which follow.

1. In this case, the time by which the four-year limitation was exceeded is quite short—two and a half to three months. This is in sharp contrast to the only case where this Court has held complaints to be barred by Rule 15: *In re Cicchetti, supra,* at 306–10, where the acts complained of had occurred *twenty* and *thirteen years* before *any* complaint was made.

2. There is another contrast with the *Cicchetti* case. In *Cicchetti* there were individual victims who were complaining of sexual harassment who had made no complaint for twenty years in one case, and thirteen years in another. There we pointed out that in a case involving similar conduct: indecent assault and rape, the Pennsylvania Supreme Court was much less willing to consider the merits of a charge that was not filed promptly, holding that "the lack of a prompt complaint by a victim of a crime, although not dispositive of the merits of the case, may justifiably produce a doubt as to whether the offense indeed occurred, or whether it was a recent fabrication by the complaining witness." *Commonwealth v. Lane,* 521 Pa. 390, 555 A.2d 1246, 1250 (1989). That was true in *Cicchetti,* i.e. the long delay and the nature of the conduct produced doubt as to whether the conduct had, in fact, occurred. There is no doubt here, in this Court's judgment, that everything that Neill said happened in the *Martorella* case happened.

3. There is no worry in this case that Neill's allegations were "a recent fabrication" for, in this case Neill made an *immediate* complaint. He was not making something up after four years passed. Neill testified that immediately after his first conversation with Respondent about Martorella, he went back to the state police barracks and reported Respondent's conduct to his superior officer, David Liberum, the supervisor of the White Collar Crime Unit. (N.T. 172, 176–77). Neill testified he did not report this to anyone else, including the Judicial Conduct Board; but it would not be unreasonable to conclude that Neill considered his responsibility to report the incident at an end upon making his report to Trooper Liberum.

4. Probably the most important factor justifying the Board's determination that it should consider the conduct of Respondent in regard to the *Martorella* case is the conduct itself. To say it was egregious would be to understate; to say it is the embodiment of the kind of judicial conduct which the Judicial Conduct Board was created to eradicate would be accurate. To hold that the Judicial Conduct Board was prohibited, by its own rule,[3] from considering the information furnished by Trooper Neill would pervert the labors of the authors of the constitutional amendment which brought the Judicial Conduct Board into being.

We hold that the Board's determination that there was good cause to pursue its

that due process is accorded judicial officers subject to investigation and prosecution by the board .... Every minor or technical violation of the board's rules may not be a denial of due process, and the appropriate remedy may be a minor matter; nonetheless, the guarantee of due process requires that the board's procedures be reviewable." *In re Hasay,* 546 Pa. 481, 494–97, 686 A.2d 809, 816–17 (1996).

3. We call attention to the fact that in *Cicchetti,* Rule 15 was not the only basis for excluding the twenty and thirteen year old testimony. Fundamental fairness upon which due process is grounded was the concept relied upon. Laches was another. *See, Cicchetti, supra,* at 306–07, 310. There is no suggestion that either of those doctrines is implicated in this case.

investigation of Respondent based on the information furnished by Neill relating to Respondent's intervention in the case of *Commonwealth v. Martorella*, and to include charges relating thereto in a Complaint filed with this Court, was fully justified.

We turn now to consider the charges against Respondent arising out of his conduct in the *Martorella* case.

### (a) Conduct which brings the judicial office into disrepute.

In *In re Smith*, 687 A.2d 1229 (Pa. Ct.Jud.Disc.1996), this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute. In *In re Cicchetti*, 697 A.2d 297, 310 (Pa.Ct.Jud.Disc. 1997), this Court reiterated that notion as it concluded that a judge's conduct in persisting in making sexual advances towards a subordinate employee who repeatedly rejected the advances constituted conduct of such an extreme nature that the judicial officer had brought the judicial office itself into disrepute.

In *Cicchetti*, 697 A.2d at 312, this Court noted that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

In this case, it has been established that Respondent called Trooper Donald Neill of the Pennsylvania State Police and asked him to stop by his office. A day or two later Neill did, and Respondent took him into his office and inquired about Anthony Martorella's case. Neill had charged Martorella with Burglary, Terroristic Threats, Theft by Extortion and Harassment by Communication and Martorella's preliminary hearing was coming up before another judge. Respondent asked Neill "if there was anything he [Neill] could do about the case" inasmuch as Martorella was "really not a bad guy." So did Respondent describe Martorella while intervening on his behalf with Neill—who had witnessed Martorella threaten to kill an individual named Dobo for failing to repay a loan and who had sped to Dobo's home, and broke into the residence, all the time yelling he was going to kill Dobo. (See Findings of Fact Nos. 4–9). It is also established that after Martorella's preliminary hearing, Respondent telephoned Neill at his home urging him to agree to ARD for Martorella (Finding of Fact No. 12).

Respondent admits that he spoke to Neill about ARD for Martorella as if this was a perfectly normal thing for him to do. At his deposition Respondent testified:

A. I got a call from a friend of mine I used to work with at IBM and he said he had known somebody --I think he said he knew a Mr. Martorella and he thought he was a decent guy -- I never heard of Mr. Martorella before -- and was it possible to get -- would he be eligible for ARD?

Q. Wait a minute. Who asked you that question?

A. Some—some individual name Dennis Kearny (phonetic), okay, had called me and said, do you know -- you know, could you ask -- do you know the trooper?

And I asked him who it was. And he said Trooper Neill. I know Trooper Neill.

Q. Did you ask Kearny any questions about Anthony Martorella?

A. No. No.

Q. Have you even seen Anthony Martorella?

A. No. No.

Q. So you went to -- I mean, you talked to Trooper Neill about Martorella's eligibility for ARD just because Dennis Kearny asked you to do that?

A. Yes.

(Zupsic deposition, pp. 60–61, 63).

In *Smith*, we said that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra,* at 1239.

Certainly the reasonable expectations of the public[4] would include the expectation that a judicial officer will not make use of his high and trusted office in an overt attempt to influence a state policeman who regularly appears before him, to reduce the charges or to agree to ARD, particularly in a case where the behavior of the defendant giving rise to the charges was so violent and outrageous as Martorella's was. As we said in *In re Trkula*, 699 A.2d 3, 8 (Pa.Ct.Jud.Disc.1997):

It would be difficult to identify conduct which would more assuredly dash public confidence in that system and in the judicial office itself.

We conclude that the conduct of Respondent was so extreme as to bring the judicial office into disrepute.

(b) Conduct which prejudices the proper administration of justice.

█ This Court has held that:

Conduct which prejudices the proper administration of justice ... is conduct which obstructs or interferes with those activities which enable the systematic operation of the courts. The term "systematic operation" encompasses not only the procedures adopted by courts which aid in functioning, but also the standards of conduct expected of judicial officers in the performance of the work of the courts. Hence, when a judicial officer's conduct departs from the standard expected of judges and has the effect of obstructing or interfering with the systematic operation or normal functions of the court, his conduct *will have affected* the proper administration of the courts.

*Smith, supra,* at 1237 (emphasis the Court's).

There is certainly no question that when Respondent called Trooper Neill into his office to tell him what a nice guy Mr. Martorella was thereby making it clear to the trooper that he, the judge before whom the trooper regularly appeared, would be pleased if the trooper would reduce the charges and even consider ARD in this egregious case, he was "interfering with the systematic operation or normal functions of the court" and as we said in *Smith* "[such] conduct will have affected the proper administration of the courts." *Id.*

Again we refer to *Smith* where we said:

A judicial officer who engages in conduct which prejudices the proper administration of justice would have the added element of a mental state in which he or she not only knew that the conduct at issue consisted of some neglect or impropriety, *but also acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice, for example, by affecting a specific outcome.*

*Id.* at 1238 (emphasis added); *see, also, In re Trkula*, 699 A.2d at 8.

4. Not to mention Mr. Dobo.

It is not open to question that when Respondent called Trooper Neill into his office before Martorella's preliminary hearing, and when he called him at home, Respondent's only purpose was to "[affect] a specific outcome" and that, on both occasions, he "acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice." There is no doubt that Respondent intended that his "talking to" Neill would have a deleterious affect on the administration of justice and intended that it would prejudice the right of the people of the Commonwealth, and of Mr. Dobo, to have the case tried on its merits and without interference.

We hold that Respondent's approaches to Neill and his conversations with him was conduct which prejudices the proper administration of justice.

*PART 2.  Commonwealth v. David Presto*

█ The Board has charged that Respondent's conduct set out in Findings of Fact Nos. 13–21 is such that:

(a) brings the judicial office into disrepute, and

(b) constitutes a violation of Rule 8A of the Rules Governing Standards of Conduct of Magisterial District Judges.

We will discuss (b) first.

Rule 8A. provides:

**RULE 8.  DISQUALIFICATION.**

A. A magisterial district judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(1) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings;

(2) he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the magisterial district judge or such lawyer has been a material witness concerning it;

(3) he knows that he, individually or as a fiduciary, or his spouse or a minor child residing in his household has a financial interest in the subject matter in controversy or in a party to the proceeding or any other interest that could be substantially affected by the outcome of the proceeding;

(4) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(a) is a party to the proceeding, or an officer, director or trustee of a party;

(b) is acting as a lawyer in the proceeding;

(c) is known by the magisterial district judge to have an interest that could be substantially affected by the outcome of the proceeding;

(d) is to the knowledge of the magisterial district judge likely to be a material witness in the proceeding.

We must determine whether, given his relationship with David Presto's father, James Presto, Respondent's failure to disqualify himself in the case of *Commonwealth v. David Presto* was a violation of Rule 8A. because Respondent's "impartiality might reasonably be questioned."

The procedure to be followed and the standard to be applied in dealing with recusal motions in the trial court and on appeal were crystallized and authoritatively set down by our Supreme Court in *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985).

■ As for the procedure in the trial courts the Supreme Court said that the trial judge "may determine the question in the first instance, and ordinarily his disposition of it will not be disturbed unless there is an abuse of discretion." *Reilly, supra* at 221, 489 A.2d at 1299. Since rulings on recusal motions are interlocutory, the ruling will not be examined until the case is tried and an appeal is taken.[5] The importance of *Reilly* for this Court in seeking guidance in the enforcement of rules of conduct, is its holding as to what shall happen on appeal—and what shall not. That holding is:

> If the cause is appealed, the record is before the appellate court which can determine whether a fair and impartial trial were had. *If so, the alleged disqualifying factors of the trial judge become moot.* (emphasis the Court's).

*Reilly*, 507 Pa. at 222, 489 A.2d at 1300.

Whatever may be the impact of this holding on litigants and on litigation—and it is certainly substantial—that is not our focus here. The importance of this holding on the question here is that appellate courts will *not* be reviewing the propriety of trial judges' denials of recusal motions. As an example, *see, Southeast National Bank of Pa. v. Goldberg*, 813 A.2d 916 (Pa.Super. 2002); *Patrick v. Goldberg*, 813 A.2d 915 (Pa.Super. 2002). In its disposition of the appeals in those cases, the Superior Court stated:

[B]ecause we find, based on our review of the record, that the trial court was fully able to dispose of the matter fairly and without prejudice, the alleged disqualifying factor, namely that the trial judge should have recused on the basis of his law clerk's relationship with Cuppy, is moot [citing *Reilly*].

*See, also,* e.g., *Commonwealth v. Tharp*, 574 Pa. 202, 228–29, 830 A.2d 519, 534–35 (2003) where the Supreme Court affirmed a sentence of death despite claims that the actions of the trial judge raised doubt as to his impartiality. The Supreme Court's opinion in that case makes it clear that the sole concern of the reviewing tribunal is whether there was a fair trial—and not whether the trial judge's decision not to recuse was right or wrong—or whether it constituted a violation of some rule of conduct. The Supreme Court said:

> Although unusual and perhaps ill-advised, the trial judge's actions at sentencing do not warrant a retroactive finding that recusal at trial was required, especially in the absence of any evidence of record suggesting actual bias against appellant that may have affected the fairness of the trial.

More than simply directing that the inquiry on appeal is limited to whether there was a fair trial or not, the Supreme Court has held that the Superior Court *had no*

---

5. The case of *Municipal Publications, Inc., et al. v. Court of Common Pleas of Philadelphia County*, 507 Pa. 194, 489 A.2d 1286 (1985) is an exception for there the Supreme Court invoked its plenary jurisdiction and issued a writ prohibiting the trial judge from conducting the *recusal* hearing, which was being held after the underlying case had been tried. In that case, the Supreme Court's ruling was virtually inevitable because, in addition to a personal relationship between Judge Snyder and counsel for plaintiff and *ex parte* communications between them, "The crucial aspect of the disqualification proceedings is the fact that Judge Snyder actually permitted himself to be called as a witness and decided to give testimony concerning his own conduct. Thus he not only had personal knowledge of disputed facts but was in a position to rule on objections to his own testimony and to assess his own credibility in light of conflicting evidence. Under such extraordinary circumstances, it was clearly inappropriate for Judge Snyder to preside over the recusal hearing." *Id.* at 201, 489 A.2d at 1289.

*authority* to consider the propriety of the trial judge's decision on a recusal motion.

In its opinion in *Reilly* the Supreme Court took the Superior Court to task for some of its rulings in that case relating to standards and procedures for the recusal of trial judges which the Supreme Court viewed as matters reserved exclusively to it. For example, the Supreme Court said:

> Superior Court reasoned that the recusal standard was an objective one that created a burden to show only that a reasonable observer might question a judge's impartiality, not that the trial court's actions *actually resulted in prejudice*. In this regard, Superior Court established a rule of judicial administration that in any recusal motion, a different judge would be required to rule on the motion, because the judge being asked to recuse could not objectively address the issue of his impartiality.

*Reilly, supra,* at 218, 489 A.2d at 1298 (emphasis added). As to those rulings the Supreme Court said: "We declare this procedure inappropriate and preclude its use." *Id.*

The Supreme Court then declared the exclusivity of its jurisdiction in the enforcement of rules of judicial conduct and reproved the Superior Court for "unwarranted intrusions" thereupon. The Court said:

> In furtherance of our exclusive right to supervise the conduct of all courts and officers of the judicial branch of government pursuant to Article V, Section 10(c) of our Constitution, we have adopted rules of judicial conduct for ourselves and all members of the judicial branch. (See Rules of Judicial Conduct, effective January 1, 1974, and reported at 455 Pa. XXXIX.) *The enforcement of those rules, however, is beyond the jurisdiction of the Superior Court* and to the extent that it has attempted to inter-

pret Canon 3C by creating new standards of review on recusal motions, procedures for raising recusal questions, or for enforcement of violations of the Code, they are without effect, as unwarranted intrusions upon this Court's exclusive right to supervise the conduct of all courts and officers of the judicial branch.

* * * * *

Perceived violations of either Code do not permit the trial courts or the intermediate appellate courts to alter the rules of law, evidentiary rules, presumptions or burdens of proof. *More importantly, violations of those Codes are not a proper subject for consideration of the lower courts to impose punishment for attorney or judicial misconduct. The Constitution provides a mechanism for the enforcement of violations of the Code of Judicial Conduct* and the Judicial Inquiry and Review Board is authorized, on its own volition, where necessary, to investigate violations of the Code of Judicial Conduct (see Rule 1—Rules of Procedure Governing the Judicial Inquiry and Review Board). Upon the Board's findings and determinations recommending disciplinary action for violations of the Code, the matter is referred to this body.... *This procedure, except for impeachment proceedings, is the exclusive mode established for the discipline of our judges for violations of the Code* and we have not abdicated or delegated any of our supervisory authority in enforcing these standards of conduct to Superior Court. To presume that the Code or its alleged violations can be reviewed by any tribunal other than those we authorize is a misapprehension of the purpose of the Code, and is seen as an impermissible meddling into the administrative and supervisory functions of this Court over the entire judiciary.

*Id.* at 218–20, 489 A.2d at 1298–99 (emphasis added). *See, also, Goodheart, et al. v. Casey, et al.,* 523 Pa. 188, 198, 565 A.2d 757, 762 (1989).

It is clear, then, that the reported opinions of our appellate courts[6] in cases which come to them from trial courts which have denied recusal motions provide no precedent to guide this Court in deciding whether Respondent's failure to recuse in this case was a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Having said that—and that is certainly true so far as the intermediate appellate courts of the Commonwealth are concerned on the authority of *Reilly*—we note that in *Municipal Publications, supra,* and in a number of criminal cases, the Supreme Court has commented on the propriety of a trial judge's refusal to recuse.[7]

For example, in the *Municipal Publications* case, though specifically stating that it was not deciding the question of "whether Judge Snyder should be disqualified from the underlying libel action" the Supreme Court observed:

> The allegations on which the recusal motion was based focused upon a purported personal relationship between Judge Snyder and counsel for plaintiff Edgehill in the libel suit, and specifically upon

alleged *ex parte* discussions between them in chambers concerning the case, including the recusal motion. Taken as a whole those allegations, if true, would require Judge Snyder's disqualification from the libel action and necessitate a new trial.

*Municipal Publications, Inc., et al. v. Court of Common Pleas of Philadelphia County,* 507 Pa. 194, 201, 489 A.2d 1286, 1289 (1985).

We note that none of these Supreme Court cases came to the Court through the "mechanism for the enforcement of violations of the Code of Judicial Conduct." *Reilly, supra,* at 220, 489 A.2d at 1299 and, thus, the Court made no determination as to whether a violation of the Code of Judicial Conduct had, or had not, occurred.

Nevertheless, though not deciding that question head on, these Supreme Court cases do provide helpful insight for this Court in deciding the question.

In addition, there is one case which did come to the Supreme Court through the constitutionally prescribed mechanism for enforcement of violations of the Code of Judicial Conduct. That case, *Judicial Inquiry and Review Board v. Fink,* 516 Pa. 208, 532 A.2d 358 (1987), came to the Supreme Court from the Judicial Inquiry and Review Board (JIRB) with its recommen-

---

6. See, as well, *U.S. Steel Corporation v. Papadakos,* 63 Pa. Cmwlth. 213, 437 A.2d 1044 (1981), where the Commonwealth Court, in refusing to review Judge Papadakos's refusal to recuse in the real estate tax assessment appeal of U.S. Steel despite his public statements that he desired the assessments on U.S. Steel property to be raised, held that "the enforcement of the Code of Judicial Conduct is not within the purview of the Commonwealth Court." *Id.* at 218, 437 A.2d at 1047.

7. *See, e.g., Commonwealth v. King,* 576 Pa. 318, 839 A.2d 237 (2003); *Commonwealth v.*

*White,* 557 Pa. 408, 734 A.2d 374 (1999); *Commonwealth v. Abu-Jamal,* 553 Pa. 569, 720 A.2d 121 (1998); *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727 (1983); *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250 (1982); *Commonwealth v. Perry,* 468 Pa. 515, 364 A.2d 312 (1976); *Commonwealth v. Goodman, et al.,* 454 Pa. 358, 311 A.2d 652 (1973); *Commonwealth v. Young,* 439 Pa. 498, 269 A.2d 18 (1970); *Commonwealth ex rel. Allen v. Rundle,* 410 Pa. 599, 189 A.2d 261 (1963).

dations[8] relating to alleged violations of Canon 3(C)(1)(a) of the Code of Judicial Conduct.[9]

In that case, the Respondent was elected to office in 1977 after an acrimonious campaign in which he defeated the incumbent, Judge Patterson. In 1982, when Judge Patterson's son was brought before the Respondent on drug related charges, the defendant requested Respondent's recusal. Respondent denied the request stating he had no bad feelings about the defendant's father and that "The holy ghost came down on my shoulder and cleansed me of all those feelings." The Supreme Court held that Respondent's failure to recuse was a violation of Canon 3(C)(1)(a) for, in these circumstances, his impartiality might reasonably be questioned.

We find that this Respondent's impartiality to hear and decide the case of *Commonwealth v. David Presto*, might reasonably be questioned. The circumstances which lead to this conclusion include:

— David Presto's father, James Presto, had been hanging around Respondent's court offices for several years leading up to the time when the case against David Presto was scheduled for hearing before Respondent.

— During this time James Presto frequently had meetings with Respondent "most of the time behind closed doors."

— During this time Respondent persuaded James Presto to give him $12,000 cash as a loan for two or three weeks to John Sabino, a friend of Respondent's.

— Respondent then delivered Presto's $12,000, along with $10,000 of his own money to Sabino.

— After the two or three weeks passed without repayment, Respondent called Sabino seeking repayment on behalf of himself and Presto.

— Shortly thereafter Sabino gave Presto a check for $12,000 which "bounced." Thereupon, Respondent called Sabino threatening legal action on Presto's behalf.

There are indications that the Supreme Court expects the determination of whether a judge's impartiality might reasonably be questioned to be an objective one. *See, Commonwealth v. Darush*, 501 Pa. 15, 24, 459 A.2d 727, 732 (1983), where the Supreme Court said the trial judge should recuse when "a significant minority of the lay community could reasonably question the court's impartiality."

Since 1974, when Congress enacted revisions to the statute governing disqualification in the federal courts,[10] those courts have been employing an "objective" standard.[11] There is no doubt that is what Congress intended.[12] We are cautious

---

8. Under the constitution as then structured, i.e., before the amendments of 1993 which created the Judicial Conduct Board and this Court, JIRB held hearings and made recommendations to the Supreme Court which then conducted *de novo* review.

9. Canon 3(C)(1)(a) is identical to Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges with one (curious) exception: The canon prescribes what the judge "should" do; the rule prescribes what the magisterial district judge "shall" do.

10. *See,* 28 U.S.C. § 455.

11. *See, e.g., Pepsico v. McMillen,* 764 F.2d 458 (7th Cir.1985); *Home Placement Service, Inc., et al. v. Providence Journal Company,* 739 F.2d 671 (1st Cir.1984); *U.S. v. Sellers,* 566 F.2d 884 (4th Cir.1977).

12. *See,* Report of the House Committee on the Judiciary, H.R.Rep. No. 93–1453, 93rd Cong. 2nd Sess. *Reprinted* [1974] U.S.Code Cong. & Admin. News, pp. 6351, 6354–55.

about relying on cases from other jurisdictions on matters of judicial discipline,[13] nevertheless, we find it appropriate here because the language of the federal statute is identical to Rule 8A. which we are here called upon to enforce, and because the indications we have from our Supreme Court on this subject appear to be in concord with those of the federal courts. We call attention, particularly, to the case of *Pepsico v. McMillen, supra,* where the test was stated to be:

> [W]hether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case.

*Id.* at 460. In that opinion Judge Posner went on to make the observation that the court "Recogniz[ed] the inherently subjective character of this ostensibly objective test." *Id.* However, whatever the nature of the test is thought to be, we have little difficulty in concluding that such an observer would entertain such a doubt as to Respondent's impartiality in the case of *Commonwealth v. David Presto.*

We are mindful of what we said in *In re McCutcheon,* 846 A.2d 801 (Pa.Ct.Jud.Disc. 2004) regarding the reality of the conditions "on the ground" in the courts of our magisterial district judges in the Commonwealth. That case is the only case where this Court has considered disqualification under either Canon 3C(1) or Rule 8A., and in that case we said:

> [G]eneralities do not serve in dealing with questions of personal bias; such

determinations must be made case by case.

*Id.* at 816. In *McCutcheon* we found that the Judicial Conduct Board had failed to establish that the Respondent had a personal bias in favor of Philip Bartoe (a party) such as would bring her impartiality into question; but that case bears no resemblance to this: for example, in *McCutcheon* we found that the nature of the Respondent's contacts with Philip Bartoe were "incidental and adventitious."[14] By contrast, this Respondent's contacts with David Presto's father were part of everyday business, often in private, and included a distinctly uncommon business adventure which could be seen to have caused Respondent to become beholden to David Presto's father.

We conclude that the Judicial Conduct Board has established a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

We mention that the parties filed a number of stipulations in this case which have to do with whether Respondent's disposition of the case was justified. Such considerations are irrelevant in this Court's assessment of Respondent's alleged violation of Rule 8A.(1).[15] Review of the propriety of Respondent's disposition is the responsibility of another court in the event an appeal is taken from Respondent's order.

### (b) Conduct which brings the judicial office into disrepute.

As noted above, the Board has included this count in the Complaint, averring that the conduct of Respondent, in failing to

---

13. *In re Toczydlowski,* 853 A.2d 20, 24 (Pa.Ct. Jud.Disc.2004); *In re Crahalla,* 747 A.2d 980, 988 (Pa.Ct.Jud.Disc.2000).

14. The full text of our discussion of the alleged violation of Rule 8A.(1) in *McCutcheon* is set out at 846 A.2d at 813–16.

15. Similar stipulations were filed with respect to Respondent's disposition of the *Schupp* and *Murgenovich* cases. All of these stipulations are irrelevant and none have been included in our Findings of Fact.

disqualify himself in the case of *Common-wealth v. David Presto,* was a violation of Rule 8A.(1), and we have so found, but also that the same conduct was a violation of this additional constitutional precept. Although the Board may have found it advisable to include this charge, we find it unnecessary to address it.

In *In re Eagen,* 814 A.2d 304 (Pa.Ct.Jud. Disc.2002) this Court said:

> Unlike a criminal case in which the range of penalties is determined by the number of charges and the statutory sentence mandated for each offense upon which there is a finding of guilt, the scope of sanctions available to this Court is not so circumscribed. Any finding by this Court that a judicial officer has violated the Constitution of Pennsylvania or the Code of Judicial Conduct subjects that judge to the full range of appropriate discipline. Furthermore, in exercising our discretion in imposing disciplinary sanction, we are guided not by the number of ways the Respondent's conduct has offended the Constitution or Code, but by the nature of the conduct itself and any mitigating or aggravating circumstances.

*Id.* at 306–07. *See, also, In re Pazuhanich,* 858 A.2d 231, 234–35 (Pa.Ct.Jud.Disc. 2004); *In re Berkhimer,* 828 A.2d 19, 22 n. 1, 23 (Pa.Ct.Jud.Disc.2003); *In re Sullivan,* 805 A.2d 71, 74 (Pa.Ct.Jud.Disc.2002).

Accordingly, since we are satisfied that Respondent's conduct constituted a violation of Rule 8A.(1), we decline to address this additional charge.

PART 3. *Commonwealth v. William G. Cornell*

■ The Board has charged that Respondent's conduct set out in Findings of Fact Nos. 22–29 is such that:

(a) brings the judicial office into disrepute,

(b) prejudices the proper administration of justice, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

The conduct of Respondent in the *Cornell* case was essentially the same as in the *Martorella* case, i.e., an overt attempt to influence the prosecuting officer—in this case the Chief of the local police, whose job required him to appear regularly before Respondent, by telling him the defendant was a union guy and that he wanted to help him. Actually, the only difference is that this time the case was coming up in Respondent's court.

The same reasons and the same authority which support our conclusions in the *Martorella* case hold here and we find that the Board has established that Respondent's conduct in the *Cornell* case was:

(a) such that brings the judicial office into disrepute, and

(b) such that prejudices the proper administration of justice.

In addition, the Board has charged that Respondent's conduct in the *Cornell* case was a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges. That Rule requires a judge to disqualify himself from a case in which his impartiality might reasonably be questioned because of personal bias or prejudice.

■ We hold that a judge who interferes in a case in an attempt to affect the outcome of the case, by that act, announces his personal bias and prejudice and declares his partiality and is *ipso facto* unqualified to remain in the case; and if he does he violates Rule 8A.(1). Respondent did remain in the *Cornell* case and actually conducted the hearing and so we

find that to have been a violation of Rule 8A.(1).

*PART 4. Commonwealth v. Kelly Jo Schupp*

■ The Board has charged that Respondent's conduct set out in Findings of Fact Nos. 30–41 is such that:

(a) brings the judicial office into disrepute,

(b) prejudices the proper administration of justice, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

The elements of Respondent's conduct in this case are the same as in *Cornell* and *Martorella* in that Respondent again interfered in a case by attempting to persuade the prosecuting witness, Patricia Beahan, who had filed a private criminal complaint, to reduce the charge. Again, the case was pending before Respondent.

In addition, at Schupp's arraignment, Respondent struck up a singularly injudicious relationship with her. He told her that she didn't look like a person who would be guilty of shoplifting, that he knew the prosecuting witness and that her job as security officer at Boscov's required her to bring charges in his court frequently; he told her that the charges could be reduced and that he would help her. He gave her his cell phone number and the two had numerous phone conversations while the case was pending before Respondent. He had lunch with her at which time he told her she deserved a lesser charge and that he was going to talk to the prosecuting witness about that. True to his word, he did just that, presenting himself at Patricia Beahan's office at the Boscov's store where he solicited her to reduce the charges against Schupp.

Again, for the reasons and upon the authority set forth in our discussion of the *Martorella* case, *supra*, we find that Respondent's conduct in relation to Kelly Jo Schupp was such that:

(a) brings the judicial office into disrepute, and

(b) prejudices the proper administration of justice.

■ We turn now to consider whether, given Respondent's actions on behalf of Kelly Jo Schupp in the case against her, pending before him, Respondent's impartiality might reasonably be questioned and, thus, his failure to disqualify himself was a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

There is no doubt that Respondent's conduct in the *Kelly Jo Schupp* case, as in the *Cornell* case, demonstrated his personal bias and prejudice and made him *ipso facto* unqualified to act as the judge in that case.

We note, however, that in the *Schupp* case, the parties, i.e., the Commonwealth with the consent of Patricia Beahan on behalf of Boscov's, and the defendant, agreed that Schupp would enter a plea and would be placed in the ARD program. The arrangement was made by the parties who were all present in Respondent's court on the day of Schupp's preliminary hearing—but before the hearing. It is suggested that, because Respondent did not actually conduct a hearing, there was no violation of Rule 8A.(1).

We reject that suggestion.

■ Any trial lawyer knows that the disposition of cases is driven by the identity of the judge assigned to the case as much as by anything else. A judge need not actually preside at the trial in order to actually affect the outcome; pre-trial rulings and pre-trial behavior of the judge

affect pre-trial decisions which parties must regularly make. We do not consider that the Supreme Court, in promulgating Rule 8A.(1), intended to limit its application to cases where the judge actually conducts a trial. We believe the Supreme Court intended—certainly in a case like *Commonwealth v. Kelly Jo Schupp* where the bias of the judge is so evident and unconcealed and his partiality so recognizable—that the obligation of the Rule be not so limited. We believe the obligation to disqualify mandated by Rule 8A.(1) becomes an obligation at whatever point in the proceeding that it should be evident to the judge that his impartiality might reasonably be questioned.[16]

It seems to us, moreover, that the language of the Rule itself verifies this. Rule 8A. provides:

A. A magisterial district judge shall disqualify himself *in a proceeding* in which his impartiality might reasonably be questioned .... (Emphasis added.)

Accordingly, we find that Respondent's failure to disqualify himself in the case of *Commonwealth v. Kelly Jo Schupp* was a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

*PART 5. Commonwealth v. Anson M. Murgenovich*

██ The Board has charged that Respondent's conduct set out in Findings of Fact Nos. 42–50 constitutes such that:

(a) brings the judicial office into disrepute,

(b) prejudices the proper administration of justice, and

(c) constitutes a violation of Rule 8A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

In this case Patrolman Appelgarth filed a criminal complaint against Anson Murgenovich charging him with operating a motor vehicle while under the influence of alcohol. Shortly thereafter, while Appelgarth was in Respondent's court on other business Respondent called Appelgarth into his chambers and said: "I see you filed a charge against Anson. He's a friend of ours. Do you think there's something we could do to help him out?" Respondent then told Patrolman Appelgarth that he, Respondent, was going to be the district justice on the bench on the day Mr. Murgenovich's preliminary hearing was scheduled.

This behavior is a perfect reflection of Respondent's conduct in the *Martorella, Cornell* and *Schupp* cases which we found to be such that (a) brings the judicial office into disrepute, and (b) prejudices the proper administration of justice. Therefore, we find that his conduct in the *Murgenovich* case constituted a violation of those two constitutional provisions.

Further, we hold, for the reasons set out *supra* in the *Cornell* and *Schupp* cases

---

**16.** *See,* Abramson, *Judicial Disqualification under Canon 3 of the Code of Judicial Conduct,* 2d Ed. 1992, p. 10. "Canon 3C is intended to be used by a judge at the start of each case ... to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings." *See, also, Duplan Corporation v. Deering Milliken, Inc.,* 400 F.Supp. 497 (D.S.C.1975) and *In the Matter of Judicial Disciplinary Proceedings Against Carver,* 192 Wis.2d 136, 531 N.W.2d 62 (1995) where the Supreme Court of Wisconsin, suspended a judge "when he did not disqualify himself from the pending case promptly upon determining there was cause for his disqualification." *Id.* at 63. That court adopted the findings of the Judicial Conduct Commission that Judge Carver "was required by law to disqualify himself as soon as he learned on March 22, 1993 that the Wilcox case was assigned to him ...." *Id.* at 69.

that Respondent's failure to disqualify himself from the *Murgenovich* proceeding constituted a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

## IV. CONCLUSIONS OF LAW

*PART 1. Commonwealth v. Anthony Martorella*

1. The conduct of Respondent is such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

2. The conduct of Respondent is such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

3. The determination of the Judicial Conduct Board that there existed good cause for it to consider the acts of Respondent even though they may have taken place more than four years prior to the Board's notification thereof was justified and appropriate under the circumstances of this case.

*PART 2. Commonwealth v. David Presto*

4. The conduct of Respondent constituted a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

*PART 3. Commonwealth v. William G. Cornell*

5. The conduct of Respondent is such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

6. The conduct of Respondent is such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

7. The conduct of Respondent constituted a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

*PART 4. Commonwealth v. Kelly Jo Schupp*

8. The conduct of Respondent is such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

9. The conduct of Respondent is such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

10. The conduct of Respondent constituted a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

*PART 5. Commonwealth v. Anson M. Murgenovich*

11. The conduct of Respondent is such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

12. The conduct of Respondent is such that prejudices the proper administration of justice, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

13. The conduct of Respondent constituted a violation of Rule 8A.(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

14. For the reasons set forth in Conclusions of Law Nos. 1–13, Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## 900

PER CURIAM.

### ORDER

AND NOW, this 29th day of December, 2005, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No.503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served on the Judicial Conduct Board and upon the Respondent,

That, either party may file written objections to the Court's Findings of Fact and Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefor and shall be served on the opposing party,

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

MUSMANNO, J., did not participate in the consideration or disposition of this case.