J-A25015-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

A.F. AND S.M., : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellees :
:
v. :
:
R.F. AND S.F., :
:
Appellants : No. 238 EDA 2014

Appeal from the Order entered December 20, 2013,
Court of Common Pleas, Bucks County,
Civil Division at No. A06-2009-62286-C-33

A.F. AND S.M., : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellees :
:
v. :
:
R.F. AND S.F., :
:
Appellants : No. 1013 EDA 2014

Appeal from the Order March 21, 2014,
Court of Common Pleas, Bucks County,
Civil Division at No. A06-09-62286-C-33

BEFORE: DONOHUE, WECHT and PLATT*, JJ.

MEMORANDUM BY DONOHUE, J.: **FILED DECEMBER 08, 2014**

Appellants, R.F. ("Grandmother") and S.F. ("Grandfather"; collectively,

"Grandparents"), appeal from the trial court's orders dated December 20,

2013 and March 21, 2014, granting sole legal and physical custody of A.F.

("Child") to Appellees, A.F. ("Mother") and S.M. ("Father"; collectively,

"Parents"), and awarding attorneys' fees and costs to Parents. We affirm.

*Retired Senior Judge assigned to the Superior Court.

At the time of Child's birth in October 2007, Father abused heroin and had difficulty obtaining and maintaining a job, while Mother suffered from bipolar disorder and postpartum depression. In approximately September 2008, Mother and the Child began living with Grandparents, and later that month, after a referral to the Bucks County Children and Youth Social Services Agency (CYS), the trial court adjudicated the Child to be dependent and granted temporary legal custody and the right to physical custody to Grandparents. The trial court's order granted the Parents supervised contact as approved by CYS. In March 2009, after a dispute between the Parents and the Grandparents over Father's use of a leased car used by Mother but financed by Grandfather, the Grandparents informed Mother that she would have to leave the Grandparents residence. On May 21, 2009, the trial court entered an order stating that the Grandparents were meeting the needs of the Child, that the Child was no longer dependent, and that the Grandparents retained legal and physical custody pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, 23 Pa.C.S.A. § 5401 *et seq.*

Mother filed a custody petition on July 29, 2009, requesting partial physical custody. On September 3, 2009, the parties jointly agreed to the entry of a custody order pursuant to which the Parents would have supervised partial physical custody of Child (now almost two-years-old) on Wednesday evenings, Sunday afternoons, and on holidays by agreement. The parties agreed to make the exchanges at a local McDonald's restaurant,

that Grandmother would supervise the visits, and that Grandfather would not attend. On November 12, 2009, however, the Parents filed a petition for contempt and modification of custody. In an amended petition on November 24, 2009, the Parents alleged that the Grandparents had, among other things, unilaterally changed the location and supervisor of the visits and had failed to appear for three visits. On December 17, 2009, the parties resolved these disputes by agreeing to abide by the September 3, 2009 order.

In January 2010, the parties began participating in the Court Conciliation & Evaluation Service (CCES) process with Robert H. Menapace, Ph.D. In his report dated May 10, 2010, Dr. Menapace observed that Parents and Grandparents were "polarized, antagonistic, and argumentative." The Grandparents opposed any change in the supervised visitation schedule, accusing Mother of failing to attend to the Child's feeding and hygiene and of associating with "unsavory characters." Dr. Menapace also indicated that Grandfather suggested sexual abuse by Father, complaining that Father cuddled his daughter against his bare chest. The Child's maternal aunts, R.G. and L.F., both of whom lived with Grandparents, also hinted at sexual abuse by Father, commenting on how Father touched the Child's vaginal area when changing her diaper. In his report, Dr. Menapace did not credit these allegations, noting instead that the Child appeared to be comfortable with the Parents. Dr. Menapace

recommended lifting the supervision requirement and expanding the length of the Parents' Wednesday and Sunday visits. On July 30, 2010, the trial court entered a custody order in accordance with Dr. Menapace's recommendations, with the exchanges to take place at the local police station. The Grandparents retained sole legal custody of the Child, but the trial court ordered them to share all pertinent information regarding the Child's welfare with the Parents.

On November 3, 2010, the Grandparents filed a petition for contempt, alleging that during one visit the Parents had verbally disparaged Grandmother, and that on another occasion Father drove with the Child in the car while his driver's license was suspended. On December 3, 2010, the Parents responded by filing their own petition for contempt and a petition for modification, alleging that the Grandparents had missed three scheduled visits and that on another occasion Grandmother had dragged the Child out of the police station by the arm, refusing to allow the Child to say goodbye to Parents. A police dispatcher apparently observed this event, reporting that the Child may have hit her head during the exchange. Following a conference, the trial court entered an order on April 11, 2011, increasing the Parents' time with the Child on Sundays from four hours to eight hours.

At another custody hearing on November 4, 2011, the Parents requested that their partial physical custody rights be expanded to include overnights stays. At the hearing, Father demonstrated his successful

completion of a drug treatment program, representing that he had been drug-free for over two years, was continuing in treatment and support groups, and had agreed to voluntarily drug testing on a weekly basis. Mother offered evidence of her efforts to manage her mental health issues. The Parents presented the testimony of family members, neighbors, and friends that the Parents were now loving individuals capable of providing the Child with a clean, properly furnished and safe home environment. Both Parents commented negatively about having observed the Child call the Grandparents "Mommy" and "Daddy," and complained that the Grandparents refused to correct the Child from doing so, even upon request.

The Grandparents opposed the Parents' request for overnight visits, instead arguing for the reinstatement of supervised visits. The Grandparents accused the Parents of multiple instances of abuse, including burning the Child and allowing her to watch "scary" movies. The Grandparents also accused the Parents of neglect, including allegations that they allowed the Child to be bitten by a dog and fall off a trampoline, and saw them hitting each other. The trial court concluded, based upon the evidence presented, that the Parents had not abused or neglected the Child and rejected the Grandparents request to reinstate supervised visitation. Noting that the Parents had a prior history of physical altercations, however, the trial court also denied the Parents' request for overnight visits.

Less than three months later in January 2012, the Grandparents informed CYS that the Child had seen Father's penis during a visit. The Parents then filed a petition for contempt, alleging the Grandparents continued to withhold the Child from scheduled visits and that they had refused to exchange basic health information as previously ordered by the trial court. On March 27, 2012, CYS received another referral from the Grandparents, reporting potential drug use by the Parents. On April 3, 2012, the Parents filed a petition to modify custody to include overnight visits. On April 25, 2012, in response to the Grandparents' allegations of drug abuse, CYS made an unannounced visit to Parents home, at which time both Parents submitted to and passed drug tests.

On June 26, 2012, the trial court conducted an evidentiary hearing on the Parents' petition to modify custody. The Parents again introduced testimony of Father's employment and his successful efforts to deal with his prior drug problems. Mother testified that she was continuing her mental health treatment and was abiding by the recommendations of her doctors. In contrast, Grandmother testified, inter alia, that she, the Child and a young female cousin were all riding in a car when the Child blurted out that she had seen her father's "private parts." Again finding no support for the allegations of the Grandparents against the Parents, the trial court granted the Parents' request for overnight visits, to take place on Saturday nights on every other weekend. These overnight visits would not begin, however,

until after the submission of written proof of Father's sobriety and Mother's compliance with recommended treatments. The trial court also ordered both Parents to submit to additional tests, including hair follicle drug testing every ninety days, Father to complete an anger management class, and Mother to undergo a medical examination to confirm that she was physically able to care for a four-year-old child in light of the fact that she was receiving Social Security Disability payments. The trial court also ruled that the Grandparents had failed to abide with the directive to communicate with the Parents regarding the Child's medical issues, and ordered the parties to participate in counseling to combat the acrimonious nature of their relationship.

On December 21, 2012, the Parents filed a petition for contempt and modification alleging, inter alia, Grandparents had failed to provide information regarding the Child's schooling and outside activities, failed to advise parents of medical visits, and made false reports to CYS. The Parents requested legal and primary physical custody with periods of partial custody by Grandparents. On January 22, 2013, the Grandparents filed an emergency petition for modification, alleging that during an overnight visit, the Parents had permitted the Child to view pornographic movies. The Grandparents also submitted to the trial court a note from Sue Cornbluth, Psy.D. ("Dr. Cornbluth"), a clinical psychologist retained by the Grandparents, who advised that the Child had reported to her that "Daddy"

was sexually abusing her and that she had seen pornographic movies on Mother's telephone on two occasions. In the note, Dr. Cornbluth offered her professional opinion that all visits with Father be terminated immediately and that visits with Mother be supervised. The Parents then filed their own petition for emergency relief and for contempt, claiming that the Grandparents had failed to appear at the most recent custody exchange location.

In response to these filings, the trial court entered an order suspending the Parents' visitations pending a conference before the master on January 24, 2013, and an emergency hearing was scheduled for February 1, 2013. Following a conference with counsel, the trial court suspended further action to permit the District Attorney's Office and CYS to continue with their active investigations into the multiple allegations. The trial court also entered an emergency shelter care order, placing the Child in Christ's Home for Children ("Christ's Home").

During custody hearings on May 15-16, 2013, the trial court, counsel, and Detective Kevin Cornish of the Bensalem Township Police Department viewed, *in camera*, video recordings of the Child taken by Parents as well as photographs and video recordings of the Child found on Grandfather's iPad. In a series of videos, the Child told Parents that her Grandfather was "saying disgusting crap" and was performing sexual acts on dolls. Detective Cornish also described the information viewed on Grandfather's iPad for the record,

including a number of photographs and videos taken with the iPad that appeared to have resulted from the Child playing with the camera. Three of the photographs are of the Child's genital area (with underwear) and depict the Child exposing herself to the camera and making sexually suggestive statements. Finally, Detective Cornish testified that forensic examination of Grandfather's iPad showed that the device had been used to access numerous pornographic websites, and that some of these pages were still open (providing instant access) while in the Child's possession. The trial court also heard testimony that the Child, now five years of age, had approached a maintenance man at Christ's Home and acted like she was "hitting on him."

The trial court found that the Child had, at a minimum, been exposed to pornography and needed immediate professional help. It was determined that the Child would remain at Christ's Home while the trial court contacted the solicitor for CYS to locate appropriate treatment options, and that the parties would be allowed only supervised visitation. The Child subsequently began treatment with Veronique N. Valliere, Psy.D, a Licensed Psychologist ("Dr. Valliere"). The Parents filed a motion to resume the custody hearing adjourned on May 17, 2013. At a hearing on November 8, 2013, the trial court ordered the Child to remain at Christ's Home until the completion of the custody proceedings. The custody hearings resumed on November 25, 2013 and continued on December 6, 9, 11, and 12, 2013. On December 20,

2013, the trial court issued its order granting the Parents sole legal and physical custody of the Child, superseding all prior orders. On December 27, 2013, the Parents filed a motion for attorneys' fees and costs, and on March 21, 2014, the trial court entered an order awarding the Parents $14,225.00 in attorneys' fees and $134.00 in costs, to be paid within ninety days.

On appeal, Grandparents raise eleven issues for our consideration and determination:

1. Did the trial judge [] err as a matter of law and abuse her discretion in denying Grandparents' July 31, 2013, motion to recuse her?

2. Did the trial judge [] err as a matter of law and abuse her discretion in improperly defining, allocating, and applying the burden of proof, and the criteria, for the Parents to be granted sole legal and physical custody of the Child?

3. Did the trial judge [] err as a matter of law and abuse her discretion in failing to award custody based on full consideration of the best interest factors set forth in 23 Pa.C.S.A. § 5328?

4. Did the trial judge [] err as a matter of law and abuse her discretion in finding that awarding sole legal and physical custody of the Child to the Parents was in the Child's best interest?

5. Did the trial judge [] err as a matter of law and abuse her discretion in either ignoring, misconstruing, or giving insufficient weight to all of the video evidence introduced, including the CAC interviews with the Child, and the videos retrieved from Parents' phone?

6. Did the trial judge [] err as a matter of law and abuse her discretion in relying on purported facts

- 10 -

and circumstances which were not of record in her various rulings during the trial?

7.    Did the trial judge [] err as a matter of law and abuse her discretion in failing to set forth her *ratio decidendi* under 23 Pa.C.S. § 5328(a), as required by 23 Pa.C.S.A. § 5328(d), for the change of custody to the Parents at or near December 20, 2013, when she rendered judgment, and prior to the deadline for Appellant Grandparents to notice their appeal?

8.    Did the trial judge [] err as a matter of law and abuse her discretion in granting the motion/application for attorney's fees without first conducting an evidentiary hearing at which Grandparents could contest the motion?

9.    Did the trial judge [] err as a matter of law and abuse her discretion in granting the motion/application for attorney's fees, when such pleading failed to allege facts entitling the movants to such relief?

10.   Did the trial judge [] err as a matter of law and abuse her discretion in finding that Grandparents acted in bad faith, made false allegations, filed frivolous motions, or otherwise engaged in conduct which was "dilatory, obdurate and vexation?"

11.   Did the trial judge [] err as a matter of law and abuse her discretion in awarding the attorney's fees and costs in the amount of $14,225.00 and 134.00?

Grandparents' Brief at 3-5. On March 20, 2014, the trial court issued an initial written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. On or about October 2, 2014, this Court remanded the case to the trial court, requesting the preparation of a supplemental opinion

addressing all of the factors set forth in 23 Pa.C.S.A. § 5328(a). On October 29, 2014, the trial court issued the requested supplemental opinion.

For their first and sixth issues on appeal, Grandparents contend that the trial judge erred in refusing to recuse herself after her receipt of a fax correspondence from Brad M. Jackman, the solicitor for CYS (hereinafter, the "CYS Solicitor"), and in relying on the information contained in the fax in granting custody to the Parents.[1] The Grandparents contend that the fax constituted an ex parte communication and that the trial court's decision to suspend the Grandparents visitation rights after its receipt constituted a violation of Canon 3(A)(4) of the Code of Judicial Conduct. Grandparents' Brief at 22. According to the Grandparents, the trial judge's refusal to recuse herself caused them to suffer prejudice and bias in the subsequent custody proceedings, resulting in an adverse custody ruling against them. *Id.*

We must first recap the relevant factual and procedural background relating to this discrete issue. On June 14, 2013, the CYS Solicitor sent a fax to the trial court attaching a memorandum from a caseworker after contact with Dr. Valliere. According to the memorandum, Dr. Valliere advised that the Child had disclosed to her that, during one of Grandparents

---

[1] While the Grandparents' sixth issue on appeal is broadly stated, their appellate brief makes clear that the "purported facts and circumstances which were not of record" are limited to those related to the recusal motion (i.e., the contents of the fax from the CYS Solicitor). Grandparents' Brief at 45.

visits to Christ's Home, her "Pop-Pop" had "said he's gonna be good now" and "[h]e's not going to touch me anymore." Motion to Recuse Judge Gibbons, 7/31/2013, Exhibit A. The fax cover sheet indicated that in light of the contents of the memorandum, the CYS Solicitor had contacted counsel for the parties and had suspended all visits pending further instructions from the trial court. The fax cover sheet further informed the trial judge that although counsel for Grandparents had denied that the Child ever referred to Grandfather as "Pop-Pop," the Child had subsequently identified a picture of Grandfather as the person to whom she was referring. *Id.*

On June 18, 2013, counsel for Grandparents sent a letter to the trial court requesting a hearing or conference regarding the suspension of visits, and on June 23, 2013, the Grandparents filed a petition to reinstate their visits with the Child at Christ's Home, requesting an evidentiary hearing. Later on June 23, 2013, the trial court issued an order suspending Grandparents' visits with Child pending further orders of court. Order, 6/23/2013, at 1. On July 26, 2013, new counsel entered his appearance on behalf of the Grandparents, and on July 31, 2013, the Grandparents filed a motion for recusal. On September 9, 2013, the Court entered an order setting a hearing on the motion for recusal for November 7, 2013. On that date, after oral argument, the trial court denied the motion.

The Grandparents argue that the trial judge's decision to suspend visitation upon receipt of the fax constituted a violation of Canon 3(A)(4) of the Code of Judicial Conduct:

**Canon 3. Judges should perform the duties of their office impartially and diligently**

The judicial duties of judges take precedence over all their other activities. Their judicial duties include all the duties of their office prescribed by law. In the performance of these duties, the following standards apply:

\* \* \*

**A. Adjudicative responsibilities.**

\* \* \*

(4) Judges should accord to all persons who are legally interested in a proceeding or their lawyers, full right to be heard according to law, and, except as authorized by law, must not consider ex parte communications concerning a pending matter.

CODE OF JUDICIAL CONDUCT, Canon 3(A)(4) (2011).[2] The Grandparents argue that the violation of Canon 3(A)(4) required the trial court to recuse itself pursuant to Canon 3(C)(1)(a), which provides that a judge should recuse himself or herself if his or her impartiality might reasonably be questioned. CODE OF JUDICIAL CONDUCT, Canon 3(C)(1)(a) (2011).

---

[2] Since the time of the events at issue here, the Code of Judicial Conduct has been extensively modified (effective July 1, 2014). The tenets of prior Canon 3(A)(4) are now incorporated into Canon 2, Rules 2.6(A) and 2.9.

The trial court insists that no violation of the Code of Judicial Conduct occurred because, inter alia, the parties (via counsel) agreed in advance that the trial court could and would discontinue visitations at Christ's Home immediately upon receipt of any negative reports from CYS. Trial Court Opinion, 3/20/2014, at 19. Based upon our review of the certified record on appeal, the trial court did in fact warn of the possibility that it might take such unilateral action. At the conclusion of the hearing on May 16, 2013, the trial court stated:

> Both of you should also understand that my concern is not whether you have contact with this child at all. The only reason I am entering this order [permitting supervised visitation] is not for you. I really don't care about you, sir, and I really don't care about the grandmother and I don't really care about the father. I don't care about the mother.
>
> This is not about you having contact with this child. This is about this child feeling abandoned. …
>
> If I have to cut everybody off because there is a problem at Christ's Home, I will do it in a heartbeat. They will call me at home. Everybody has my home phone number in this County that is involved in emergency services.

N.T., 5/16/2013, at 78-79 (emphasis added).

The record does not, however, reflect any express agreement by counsel to this approach. Neither counsel responded on the record to the trial court's warning. The trial court followed its warning by stressing the need for the parties to work together to help the Child recover from the

abuse she had suffered to date. *Id.* at 79. In response, Father said, "Yes, Your Honor," and both counsel thanked the trial court. *Id.* at 79-80.

In any event, this warning is not dispositive of the issue of compliance with Canon 3(A)(4), since nothing in the record indicates (or even suggests) that counsel for the parties agreed in advance to waive their clients' due process rights to be heard in response to unilateral action by the trial court. The trial court, relying upon the information in the fax from the CYS Solicitor, entered an order terminating the Grandparents' right to continued visitations. The Grandparents responded by filing a petition to reinstate visitations and a request for a hearing on the same. The trial court took no action on the Grandparents' petition, however, until September 9, 2013, at which time it scheduled a hearing for November 7, 2013.

Whether the trial court's failure to provide the Grandparents with a timely opportunity to be heard on the contents of the fax constitutes a violation of Canon 3(A)(4) is not for this Court to decide. Interpretation and enforcement of the Code of Judicial Conduct is beyond the jurisdiction of this Court, and instead belongs exclusively with our Supreme Court. As the Supreme Court has explained:

> In furtherance of our exclusive right to supervise the conduct of all courts and officers of the judicial branch of government pursuant to Article V, Section 10(c) of our Constitution, we have adopted rules of judicial conduct for ourselves and all members of the judicial branch. (See Rules of Judicial Conduct, effective January 1, 1974, and reported at 455 Pa.

XXXIX.) The enforcement of those rules, however, is beyond the jurisdiction of the Superior Court and to the extent that it has attempted to interpret Canon 3 C, by creating new standards of review on recusal motions, procedures for raising recusal questions, or for enforcement of violations of the Code, they are without effect, as unwarranted intrusions upon this Court's exclusive right to supervise the conduct of all courts and officers of the judicial branch.

*Reilly v. SEPTA*, 489 A.2d 1291, 1298 (Pa. 1985), *overruled on other grounds as recognized by* *Gallagher v. Harleysville Mut.*, 617 A.2d 790, 794 (Pa. Super. 1992). In *Reilly*, our Supreme Court also added:

Canon 3C, like the whole of the Code of Judicial Conduct, does not have the force of substantive law, but imposes standards of conduct upon the judiciary to be referred to by a **judge** in his **self-assessment** of whether he should volunteer to recuse from a matter pending before him. The rules do not give standing to others, including the Superior Court, to seek compliance or enforcement of the Code because its provisions merely set a norm of conduct for all our judges and do not impose substantive legal duties on them.

*Id.* (emphasis in original).

When a party requests that a trial judge recuse herself, whether based upon an alleged violation of the Code of Judicial Conduct or otherwise, the jurist must make a conscientious determination of her ability to assess the case in an impartial manner, and whether her continued involvement in the case would create an appearance of impropriety or tend to undermine public confidence in the judiciary. *See, e.g.*, *Commonwealth v. Kearney*, 92 A.3d 51, 61 (Pa. Super. 2014) (quoting *Commonwealth v. Abu–Jamal*,

720 A.2d 79, 89 (Pa. 1998)), *appeal denied*, 2014 WL 5097404 (Pa. Sept. 30, 2014). In this case, the trial court represents that it conducted a self-assessment and decided that it remained free of personal bias or interest in the outcome at all times. Trial Court Opinion, 3/20/2014, at 19-20.

On appeal, our standard of review is limited to a review of the certified record to determine whether the appellant received a fair and impartial trial on the merits of the case. *Reilly*, 489 A.2d at 1300. As our Supreme Court emphasized in *Reilly*, if the appellant received a fair and impartial trial, "**the alleged disqualifying factors of the trial judge become moot.**" *Id.* (emphasis in original); *see also In re Zupsic*, 893 A.2d 875, 891 (Pa. Ct. Jud. Disc. 2005) (intermediate appellate courts do not review the propriety of trial judges' denials of recusal motions).

We have reviewed the record of the custody proceedings conducted by the trial court, including in particular those sessions taking place after the trial court denied the Grandparents' motion for recusal (i.e., on November 25, 2013 and December 6, 9, 11, and 12, 2013). Based upon our review of the certified record on appeal, we conclude that these proceedings were fair in all respects. The trial court did not limit the Grandparents' opportunities to call witnesses or to cross-examine those called by the Parents. Moreover, the trial court's evidentiary and other rulings throughout the proceedings do

not reflect any partiality towards either party.[3] On appeal, the Grandparents do not direct our attention to any particular irregularities in the proceedings, and instead (in their sixth issue on appeal) contend only that they were prejudiced by the trial court's consideration of the contents of the ex parte fax from the CYS Solicitor. We cannot agree. At the evidentiary hearing on November 25, 2013, Dr. Valliere testified at length, relating her conversations with the Child over time, including those described in the memorandum attached to the CYS Solicitor's fax. N.T., 11/25/2013, at 4-100. Dr. Valliere also testified about the use of photographs and other information used to identify the individual who had touched her inappropriately as Grandfather ("Pop-Pop" or "Poppy"), as originally related in the CYS Solicitor's fax cover page. *Id.* at 14, 74-78. Counsel for the Grandparents had a full and fair opportunity to cross-examine Dr. Valliere in all respects, including on all issues related to the June 14, 2013 fax. *Id.* at 32-94.

Accordingly, when the trial court reached its decision to grant custody to the Parents, it had the benefit of the entirety of Dr. Valliere's testimony, and thus had no need to rely on the prior fax correspondence. As a result,

---

[3] As the trial court correctly notes, its eventual decision to grant custody to the Parents is not, in and of itself, evidence of bias or partiality. *See, e.g.*, *Commonwealth v. Travaglia*, 661 A.2d 352, 367 (Pa. 1995) ("[S]imply because a judge rules against a defendant does not establish any bias on the part of the judge against that defendant."), *cert. denied*, 516 U.S. 1121 (1996).

the trial court's receipt of the June 14, 2013 fax did not preclude the Grandparents from receiving a fair and impartial trial on the merits of the case. *Reilly*, 489 A.2d at 1300. Thus, while we do not condone the trial court's failure to provide the Grandparents with an earlier opportunity to be heard on the contents of the fax, no basis exists on this record to grant relief on their first and/or sixth issues on appeal.

For their second issue on appeal, the Grandparents argue that the trial court erred in applying a rebuttable presumption in favor of the Parents when awarding custody in this case. The Grandparents contend that although 23 Pa.C.S.A. § 5327(b) specifies that a rebuttable presumption exists in favor of the natural parents over third parties in custody disputes, the presumption should not have been applied in this case because the Grandparents had previously been awarded permanent legal custody of the Child (in May 2009). Grandparents' Brief at 27. When "the question [is] one of statutory interpretation, our scope of review is plenary and the standard of review is de novo. " *Commonwealth v. Kerstetter*, 94 A.3d 991, 997 (Pa. 2014). "[O]ur paramount interpretative task is to give effect to the intent of our General Assembly in enacting the particular legislation under review." *Commonwealth v. Spence*, 91 A.3d 44, 46 (Pa. 2014).

Section 5327(b) provides as follows:

**§ 5327.     Presumption in cases concerning primary physical custody**

> **(b) Between a parent and third party.--** In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent.  The presumption in favor of the parent may be rebutted by clear and convincing evidence.

23 Pa.C.S.A. § 5327(b).  For purposes of a custody dispute, persons other than the natural or birth parents are considered to be "third parties." *McDonel v. Sohn*, 762 A.2d 1101, 1105 (Pa. Super. 2000), *appeal denied*, 782 A.2d 547 (Pa. 2001).

This Court has described the methodology for application of this presumption:

> In **Charles**, our Supreme Court reasoned,
>
> > where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.
>
> [**Charles v. Stehlik**, 744 A.2d 1255, 1258 (Pa. 2000) (internal quotations and brackets omitted)]. Our legislature recently codified this principle in 23 Pa.C.S § 5327(b), which states in pertinent part, "In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent.  The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b).  We have

explained, "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." **In re B.C.**, 36 A.3d 601, 605–606 (Pa. Super. 2012).

Addressing the appropriate methodology in the context of the common law presumption, we elucidated

> What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

**McDonel v. Sohn**, 762 A.2d 1101, 1107 (Pa. Super. 2000) (quoting **Ellerbe v. Hooks**, 490 Pa. 363, 416 A.2d 512, 513–514 (1980)). In **Ellerbe**, **supra** at 514, our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." **Ellerbe**, **supra** at 514.

**V.B. v. J.E.B.**, 55 A.3d 1193, 1199 (Pa. Super 2012).

According to the Grandparents, the rebuttable presumption in section 5327(b) should apply only in initial custody determinations, but not in proceedings for custody modifications after a prior determination in a

dependency adjudication granting a permanent legal custodianship based upon a finding that the parents were unfit and neglectful. Grandparents' Brief at 28. In support of this interpretation of section 5327(b), the Grandparents rely primarily upon cases from sister states. *Id.* at 31-33. The Grandparents also reference a statement in a footnote in a recent case from this Court involving a custody dispute between parents and grandparents, to the effect that "parents will only be able to obtain primary custody upon a showing that it serves the best interest of the Child." *In re S.H.*, 71 A.3d 973, 983 n.5 (Pa. Super. 2013).

We conclude that the trial court did not err in applying the presumption in favor of the Parents in this case. Contrary to the Grandparents' attempts to find inconsistencies in the relevant statutory provisions, the language of section 5327(b) provides that the presumption applies "**in any action** regarding the custody of the child between a parent of the child and a nonparent." 23 Pa.C.S.A. § 5327(b) (emphasis added). In ascertaining the intent of the General Assembly, the best indication "is the plain language of the statute," and "when the words of a statute are clear and unambiguous, we may not go beyond the plain meaning of the language of the statute under the pretext of pursuing its spirit." *In re D.M.W.*, ___ A.3d ___, 2014 WL 5088797, at *2 (Pa. Super. Oct. 10, 2014) (quoting *Commonwealth v. Walter*, 93 A.3d 442, 450 (Pa. 2014)). The language of section 5327(b) is clear and unambiguous, instructing that the

presumption applies in **all** custody proceedings between parents and third parties, and this language offers no basis for exceptions of the sort now proffered by the Grandparents. Our decision in **In re S.H.** is not inconsistent with this conclusion, since the best interest of the child remains the *sine qua non* of every custody proceeding, whether or not the presumption in section 5327(b) applies.

For their third and seventh issues on appeal, the Grandparents contend that the trial court failed to award custody based upon the factors set forth in 23 Pa.C.S.A. § 5328(a), and failed to set forth its analysis on the record prior to the expiration of the 30 day appeal window after its award of custody on December 20, 2013. **C.B. v. J.B.**, 65 A.3d 946, 951-52 (Pa. Super.), *appeal denied*, 70 A.3d 808 (Pa. 2013).

No relief is due on these issues. With respect to the third issue on appeal, on March 20, 2014 the trial court issued a comprehensive 43-page opinion pursuant to Pa.R.A.P. 1925(a) setting forth in detail the reasons for its custody decision. While it is true that this Court remanded for a supplemental Rule 1925(a) opinion on the section 5328(a) factors, we did so only to allow the trial court to provide a factor-by-factor review to aid in our appellate review. In remanding the case, we did not conclude that the trial court had failed to consider all of the section 5328(a) factors, but rather only requested only that the trial court revise its analysis to offer us a *seriatim* review of each of the fifteen listed factors.

With respect to the seventh issue on appeal, this issue is waived for failure to include it either in the Grandparents' initial Rule 1925(b) statement filed on January 21, 2014 or their amended Rule 1925(b) statement filed on April 28, 2014. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph are waived."). Even if it had not been waived, however, we would not grant relief. In announcing its decision at the conclusion of the hearing on December 20, 2013, the trial court set forth the fundamental bases for its custody decision, including that the Parents drug abuse and mental health issues had largely been resolved, that the Parents' and Grandparents' differences were irreconcilable and their hatred and animosity towards each other was so palpable that it had infected all aspects of the Child's life, that the Child's last reports of sexual abuse identified Grandfather as the perpetrator, and that the Grandparents displayed a lack of supervision over the Child and a loss of perspective and ability to analyze situations involving the Child. N.T., 12/20/2013, at 22-28. This explication of the trial court's reasons for its custody decision was sufficiently detailed to permit the Grandparents to file their appeal and comply with the dictates of Pa.R.A.P. 1925(b). *See M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super.) ("[T]here is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the

- 25 -

custody decision is based on those considerations."), *appeal denied*, 68 A.3d 909 (Pa. 2013).

For their fourth and fifth issues on appeal, the Grandparents argue that the trial court erred as a matter of law and abused its discretion in awarding custody of the Child to the Parents. Grandparents' Brief at 34-42. The Grandparents specifically contend that the trial court ignored, misconstrued, or gave insufficient weight to certain "smoking gun" video evidence in which the Child, inter alia, said "My Daddy tried to do sex with me," and was allegedly coached by Parents to accuse Grandfather of molesting her while absolving Father of any responsibility for the same. ***Id.*** at 42-43.

We begin with our scope and standard of review:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.
>
> With any child custody case, the paramount concern is the best interests of the child. This standard

requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super.) (quoting *J.R.M. v. J.E.A.*,

33 A.3d 647, 650 (Pa. Super. 2011), *appeal denied*, 68 A.3d 909 (Pa. 2013).

Pursuant to the Child Custody Act, a trial court must consider specific

factors when entering or modifying a custody order:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[4]

---

[4] Pursuant to the Act of Dec. 18, 2013, P.L. 1167, No. 107, § 1, the legislature added an additional factor, numbered 2.1, relating to consideration of child abuse and involvement with protective services. *M.E.V. v. F.P.W.*, 100 A.3d 670, 671 n.2 (Pa. Super. 2014). Because the trial court granted sole legal and physical custody of Child to the Parents on December 20, 2013, and because the amendment adding section 2.1 did not

In its initial and supplemental Rule 1925(a) opinions, the trial court comprehensively reviewed every factor in section 5328(a), setting forth its determination on each factor and the evidence relied upon for each such determination. Pursuant to our review of the record, we conclude that substantial evidence supports the findings of the trial court. The trial court's analysis of those factors related to the Child's safety, including in particular the conflicting allegations of sexual abuse, was particularly thorough, and as the introductory language of section 5328(a) requires, the trial court gave weighted consideration to these factors.

Even if we were so inclined to do so (which we are not), we could not grant relief based upon the Grandparents' contention that the trial court gave insufficient weight to certain video evidence. This evidence was only a small part of the quantum of evidence introduced during the custody proceedings, and in any event, our standard of review necessitates that "with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *J.R.M.*, 33 A.3d at 650.

For their final four issues on appeal, the Grandparents claim that the trial court erred as a matter of law or abused its discretion in awarding the Parents attorneys' fees and costs. Grandparents' Brief at 46-51. The

---

become effective until January 1, 2014, factor 2.1 has no application in this case.

Grandparents argue that the trial court could not award attorneys' fees and costs without a separate evidentiary hearing, and that the trial court's findings of fact (including its refusal to reach a final determination on whether Grandfather sexually molested the Child) do not in any event support such an award. *Id.*

The trial court awarded attorneys' fees and costs here under 42 Pa.C.S.A. § 2503(7) and 23 Pa.C.S.A. § 5339. Pursuant to section 2503(7), a participant is "entitled to a reasonable counsel fee as part of the taxable costs of the matter ... as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter." 42 Pa.C.S.A. § 2503(7). Pursuant to section 5339, in a custody matter "a court may award reasonable interim or final counsel fees, costs and expenses to a party if the court finds that the conduct of another party was obdurate, vexatious, repetitive or in bad faith." 23 Pa.C.S.A. § 5339. Obdurate is defined as unyielding or stubborn. *Scalia v. Erie Insurance Exchange*, 878 A.2d 114, 116 (Pa. Super. 2005).

Our standard of review when considering an award of attorneys' fees and costs is as follows:

> The trial court has great latitude and discretion with respect to an award of attorneys' fees pursuant to a statute. *Cummins v. Atlas R.R. Construction Co.*, 814 A.2d 742, 746 (Pa. Super. 2002). In reviewing a trial court's award of attorneys' fees, our standard is abuse of discretion. *Lucchino v. Commonwealth*, 570 Pa. 277, 284, 286, 809 A.2d

264, 269-70 (2002); **Miller v. Nelson**, 768 A.2d 858, 861 (Pa. Super. 2001). If there is support in the record for the trial court's findings of fact that the conduct of the party was obdurate, vexatious or in bad faith, we will not disturb the trial court's decision.

**In re Padezanin**, 937 A.2d 475, 483-84 (Pa. Super. 2007) (quoting **Scalia**, 878 A.2d at 116). While a separate evidentiary hearing is often the preferred course, **State Farm Mut. Auto. Ins. Co. v. Allen**, 544 A.2d 491, 494 (Pa. Super. 1988), "[i]f the record supports a trial court's finding of fact that a litigant violated the conduct provisions of the relevant statute providing for the award of attorney's fees, such award should not be disturbed on appeal." **Kulp v. Hrivnak**, 765 A.2d 796, 799 (Pa. Super. 2000) (quoting **Thunberg v. Strause**, 682 A.2d 295, 299 (Pa. 1996)).

The trial court awarded attorneys' fees and costs to the Parents for the following reasons:

> In the instant case, this [c]ourt finds that [Grandparents] acted in bad faith by making and pursuing numerous false allegations against Parents, including false allegations of sexual abuse, in order to obtain sole physical custody of Parents' six-year-old daughter (the Child) and to retain sole legal custody of the Child. This [c]ourt further finds that Grandparents' conduct during the course of the custody litigation was dilatory, obdurate and vexatious. The bases of these findings are set forth in detail in this [c]ourt's Opinion dated March 20, 2014, and will, therefore, not be reiterated here.

Trial Court Memorandum Opinion and Order, 3/21/2014, at 1.

In its March 20, 2014 opinion, the trial court reviewed the evidence supporting the Grandparents' repeated allegations of physical abuse and neglect by the Parents over time, including claims that the Child, while in the Parents' temporary custody during visits, had been bitten by a dog, suffered a concussion while falling off a trampoline, was allowed to watch scary movies, and was burned. The trial court concluded that these claims were all either false or unsupported by substantial evidence. The trial court also reviewed the evidence to support the Grandparents' allegations that Father sexually molested the Child, concluding (as CYS had already done) that these allegations were baseless. Trial Court Opinion, 3/20/2014, at 34. In addition, the trial court noted that there was substantial evidence to prove that the "evidence" relied upon by Grandparents in support of these allegations, including for example the Child's statement that "Daddy tried to do sex with me," was false and manufactured by the Grandparents. *Id.* at 34-35. The trial court found, and the certified record on appeal supports, that the Child was merely parroting words she did not understand and that she had been coached to say them by Grandmother, Grandfather, or both. *Id.* at 35.

As we conclude that the record in this case supports the trial court's findings of fact that the conduct of the Grandparents was obdurate, vexatious or in bad faith, we will not disturb the trial court's decision to

award attorneys' fees and costs to the Parents. No relief is due on the Grandparents' final four issues on appeal.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2014